

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-76,264

**EX PARTE JESSE BENAVIDES, Applicant**

### ON APPLICATION FOR WRIT OF HABEAS CORPUS
### IN CAUSE NO. 2001-CR-0493-W1
### FROM THE 187TH JUDICIAL DISTRICT COURT
### BEXAR COUNTY

**HOLCOMB, J., filed a dissenting opinion.**

I respectfully dissent. After reading the record carefully, I conclude that we should accept the trial court's recommendation to grant relief. The record supports the trial court's finding that Irma Pennington's habeas testimony was, in relevant part, "credible and believable" and "persuasive." The record also supports the trial court's conclusion that, in light of this newly discovered evidence, no reasonable juror could have convicted Jesse Benavides of the charge contained in the indictment.

Allow me to review the basic facts, as they are reflected in the record. On March 22, 2000, Pennington gave a sworn statement to the Bexar County Sheriff's Office in which she claimed that

Benavides "assaulted" her in her home on May 11, 1999. Penningon described the "assault," in relevant part, as follows:

> "He sat down next to me [on her couch] and he got really close and started touching my chest and putting his hand down my pants and I didn't fight.
> "I am [a] disabled Army nurse and I remember always telling my patients and their family [sic] that women should not resist rape and the injuries would be minimal. It was very difficult to not do anything but I didn't resist.
> "The thing [sic] I didn't want to make him mad and the thing I said nicely was I don't feel very comfortable with the things that he was doing. He asked where the bed was and he held my hand and took me to the bed that is next to the living room. He took my clothes off, he only unzipped his pants and brought them down a bit to about his knees and introduced his penis into my vagina and did not stay very long. I do not known [sic] if he finished because I don't have sensation on my right side even on the inside." (Some capitalization omitted.)

On January 11, 2001, a Bexar County grand jury returned an indictment charging Benavides with sexual assault under Texas Penal Code § 22.011(a)(1)(A) and (b)(1).[1] The indictment alleged that, on or about May 11, 1999, Benavides, without Pennington's consent, "intentionally and knowingly cause[d] the penetration" of her sexual organ with his sexual organ, and that he "intentionally and knowingly compelled [her] to submit and participate by the use of physical force and violence."[2] Note that the indictment's allegation of "physical force and violence" on the part of Benavides does not comport with Pennington's sworn statement given to the Bexar County Sheriff's Office.

On July 24, 2001, Benavides, pursuant to a very favorable plea bargain, pled "no contest" to

---

[1] Texas Penal Code § 22.011(a)(1)(A) provides that "[a] person commits an offense if the person intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means, without that person's consent." Texas Penal Code § 22.011(b)(1) provides that "[a] sexual assault under Subsection (a)(1) is without the consent of the other person if the actor compels the other person to submit or participate by the use of physical force or violence."

[2] The punishment range for sexual assault is two to twenty years in prison and a possible fine of up to $10,000.

the charge in the indictment. On that same date, Benavides signed a pre-printed form entitled "Waiver, Consent to Stipulation of Testimony," in which he conceded that "all of the acts alleged [in the indictment] are true."

On October 1, 2001, the trial court, following the terms of the plea bargain, deferred a finding of Benavides' guilt and placed him on community supervision for a period of seven years.

On November 6, 2006, the State filed a motion to revoke Benavides' community supervision and to proceed to an adjudication of his guilt.

On February 6, 2007, the trial court revoked Benavides' community supervision, adjudged him guilty of sexual assault as charged in the indictment, and assessed his punishment at imprisonment for twenty years.

On April 21, 2009, Benavides filed an application for writ of habeas corpus on the ground of "actual innocence." In his application, Benavides claimed that "when [he] and the complainant finally met [in court in 2007], she stated unequivocally that she had never seen him before." He argued further that "no reasonable juror could have convicted [him] where the complainant stated she had never seen [him] before in her life." Attached to Benavides' application was Pennington's affidavit, dated January 30, 2008, in which she stated: "I was present in court on December 19 and 20, 2007 and saw Jesse Benavides and nothing in him [sic] appeared recognizable. I did not recognize him as the person that assaulted me sexually in [sic] 11 May 1999."[3] (Some capitalization omitted.)

On September 29, 2009, the trial court held an evidentiary hearing on Benavides' application

---

[3] I have found nothing in the record indicating that Benavides was in court on December 19 and 20, 2007. Perhaps Pennington was mistaken as to the date.

for habeas relief. At that hearing, Pennington testified, in relevant part, as follows:

Q: You were the victim of a sexual assault; is that correct?[4]

A: Yes.

Q: The next time – the first time that I [Defense Counsel] saw you was when Mr. Benavides, who was on probation, he was in here being sentenced on a motion to revoke his probation about one year ago. Is that correct?

A: Yes, it's correct.

* * *

Q: All right. Thank you for that. And during that hearing you came to me and stated, quote, that you did not recognize Mr. Benavides as the man that assaulted you. Is that correct?

A: Yes.

* * *

Q: Is this the man, Mr. Benavides, that sexually assaulted you?

(Counsel pointing.)

A: No.

Q: Are you certain.

A: Yes.

* * *

Q: Is there any question in your mind, on May the 11th of 1999, did somebody, someone, anybody sexually assault you on that day?

A: Yes. And, unfortunately, yes, I had suffered a sexual assault earlier one year, so I wasn't sure – I was already traumatized.

Q: Okay. And so, the answer to my question –

---

[4] No one explained to Pennington the statutory definition of "sexual assault," and we do not know how she understood that term.

A: Yes.

Q: – is yes, on May the 11th, 1999, you were sexually assaulted?

A: Yes.

Q: And did that sexual assault take place in your home?

A: Yes.

*   *   *

Q: And after the person [from the auto body shop] came inside your house with you – and I [the State] don't want to go into all the details of it – but did that person, the male with the name "Flaca" on the uniform who worked at the body shop, did that person sexually assault you on May the 11th of 1999?

A: You know, sexually assaulted, that's kind of – the severity, it's very –

Q: I can put it another way.

A: It's a word that doesn't fit, because I was not assaulted –

Q: Okay.  Let me ask you this –

A: It was consensual, I guess you can say.

Q: Well, let me ask you this: Did the person who drove you home have sex with you on that day?

A: Yes.

Q: And did you invite that person, who drove you home that day, to have sex with you on that day?  Did you say to him, "I want to have sex with you"?

(Witness laughs.)

A: I don't remember.

Q: Do you recall ever having made a statement that would indicate that you did not consent to having sex with him before?

A: No.

Q: You don't recall ever having made a statement –

A: Saying "no"? No.

Q: Okay. Did you tell anybody from law enforcement, a police officer, that somebody sexually assaulted you on that day?

A: I never used those words. I never said it was sexually assault – sexual assaulted. It's something that I never said.

Q: Okay. Do you recall telling anyone from law enforcement that the person who had sex with you on that day, that you told that person that you were uncomfortable with what they were doing?

A: Yes.

Q: Okay. Do you recall telling – do you recall having a meeting with another prosecutor from my office, a lady, okay, and her name was Kirsta Melton, do you remember that name?

A: Yes.

Q: Do you remember having a conversation with her about the sexually – the crime that happened to you on that day?

A: Yes.

Q: Okay. In that conversation with her, do you recall telling her that you told the person who had sex with you "no" at least three times?

(Witness laughs.)

A: No, I don't remember saying that. I never said – I don't think I ever said "no."

Q: Okay. Did you, on the day when somebody had sex with you at your house, okay, is that something that you wanted to happen that day?

A: Wanted? No.

Q: You did not want that person to have sex with you?

A: No, but I allowed him to.

Q: Okay.

A: And that's the thing, that's exactly what I told the person, that I didn't – that I said only one time that I was uncomfortable, but I never said "no."

\* \* \*

Q: Before 1995, were you employed in some capacity?

A: Yes, I was a nurse in the Army.

Q: Okay, as a nurse in the Army, did you have occasion to meet victims of sexual assault?

A: Yes.

Q: Okay. And did those experiences teach you something about the experience of being sexually assaulted?

A: Yes. "Never say no."

Q: Okay. And why is that? Why is it that you formed the conclusion that a victim of sexual assault should never say "no"?

A: Because more injuries occur.

Q: Okay. And do you think that might be one reason why on May the 11th, 1999, you did not want to say "no" or resist more strongly?

A: It's possible, perhaps. I don't remember.

\* \* \*

Q: Okay. So there's really no question, though, at this time that, again, somebody had sex with you on that day, May 11th, 1999, and it was not with your consent?

\* \* \*

A: It was – those words are not proper, because I wouldn't say that it was not with my consent. It was with my consent.

\* \* \*

Q: Okay. But, again, my question is, do you believe that your memory of what happened to you on May the 11th of 1999 was more clear in the months immediately following that day or do you believe that your memory of those events is more clear today?

A: The memory of those events, I think, is the same now as they were before.

Q: Okay. Mrs. Pennington, can you tell us how old you are today?

A: 57.

\* \* \*

Q: Okay. Are you being – have you been threatened or promised, or anything, for your testimony?

A: No.

A second witness at the habeas hearing, Kirsta Melton, testified in part as follows:

Q: Ms. Melton, can you tell the court how you're employed?

A: I am an Assistant Criminal District Attorney.

\* \* \*

Q: Okay. And were you the prosecutor assigned to [Benavides'] case?

A: I was.

\* \* \*

Q: Okay. And did you – during the course of preparing for [the plea bargain hearing], did you have occasion to have an – to interview the victim in the case, a woman by the name of Irma Pennington?

A: Yes.

\* \* \*

Q: And do you recall, after having an opportunity to review [your] notes, in your conversation with Ms. Pennington, did she tell you that someone had sexually assaulted her on May the 11th of 2001?

A: Yes.

Q: 1999, sorry.

A: Yeah, the date I don't recall. But, yes, when Ms. Pennington came in to visit me, we talked about the rape that occurred when she was driven home from the auto body shop by a man named Jesse Benavides, who she knew as "Flaca."

Q: Okay. And did she indicate to you that on that occasion – when that person began to make sexual advances towards her, that she told that person she was uncomfortable with that?

A: Yes.

Q: And you recall whether she told you that she also told that person "no" on a number of occasions?

A: At least three times.

On October 26, 2009, the trial court entered into the record twenty-three pages of fact-findings and conclusions of law, and recommended that we grant the habeas relief requested, i.e., a judgment of acquittal. Among the trial court's fact-findings were the following:

(1) "[T]here has never been any evidence presented at any stage of this case that [Benavides] intentionally or knowingly compelled [Pennington] to submit or participate by the use of physical force or violence."

(2) "This Court does not believe that Irma Pennington was intentionally lying when she stated that she didn't recognize [Benavides] as the man who sexually assaulted her. However, this Court questions whether such testimony is credible in light of the other evidence that establishes that [Benavides] was in fact the man who drove [Pennington] home from the body shop on May 11, 1999."[5]

(3) "Irma Pennington does not believe that [Benavides] sexually assaulted her."

(4) "Irma Pennington's testimony that she consented and 'allowed' [Benavides] to

---

[5] For the purposes of Benavides' application for habeas relief, and for the purposes of the present discussion, we may assume that Benavides was the person who drove Pennington home from the auto body shop on the day in question. That is why I have not discussed the evidence pointing to Benavides as the person who drove Pennington home.

engage in sexual activity with her, even though it made her uncomfortable, [is] credible and believable."

(5) "[W]hat is persuasive to this Court . . . is Irma Pennington's testimony that what occurred between her and [Benavides], although making her uncomfortable, was 'consensual.'"

(6) "[T]his Court also believes that Irma Pennington meant 'consensual' in a way that would mean that [Benavides] would be found actually innocent of sexual assault."

Among the trial court's conclusions of law was the following: "[T]his Court concludes that the newly discovered evidence does clearly and convincingly show . . . that no reasonable juror could have found [Benavides] guilty in light of the new evidence."

To succeed in an "actual innocence" claim, an applicant must show by "clear and convincing evidence" that no reasonable juror would have convicted him in light of the newly discovered evidence.[6] *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex.Crim.App. 1996).

When assessing an actual innocence claim, this Court must normally defer to the trial court's fact-findings, because the trial court could actually see and hear the witnesses and was, therefore, in the better position to assess the weight and credibility of the witnesses' testimony. *Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex.Crim.App. 2007).

I am satisfied that Benavides has shown by clear and convincing evidence that no reasonable juror would have convicted him in light of Pennington's habeas testimony. The indictment alleged that Benavides used "physical force and violence" to compel Pennington to submit to his sexual advances. It is not clear to me that the State ever had any evidence to prove the allegation of "physical force and violence," but, in any event, given Pennington's clear and direct testimony at the

---

[6] To prove a proposition by "clear and convincing evidence" is to prove that the proposition is "highly probable." K. Broun (ed.), *McCormick on Evidence* § 340 at 487 (6th ed. 2006).

habeas hearing, which the trial court found persuasive, no reasonable juror could have found that Benavides used physical force and violence to compel Pennington to submit. Notably, nothing in the record suggests why Pennington, an adult woman of apparently sound mind, would testify as she did unless her testimony was the truth.

I strongly suspect that the State has always known that it had an extremely weak case against Benavides. As I noted earlier, Pennington's March 22, 2000, statement to the Bexar County Sheriff's Office is inconsistent with the factual allegations in the indictment. Perhaps that is why the State agreed to such a favorable plea bargain for such a serious charge.

Unlike the majority, I see no basis on which to reject the trial court's fact-findings. I do not see that Pennington's habeas testimony was "evasive" or "contradictory." Nor do I see that she "wavered on the issue of consent" or that her "position" on whether she was sexually assaulted "changed drastically" midway through her testimony. I think the most that can be said on this record is that, midway through her testimony, Pennington realized that "sexual assault" was an inaccurate term to apply to what happened between her and Benavides.

We will never know exactly what happened between Pennington and Benavides on the day in question. But I do know that Benavides has shown to the requisite degree of certainty that, in light of this new evidence, no reasonable juror would have found that he forcefully and violently assaulted Pennington.

I respectfully dissent.


FILED MAY 26, 2010

DO NOT PUBLISH